2026 IL App (1st) 251327-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

FIRST DIVISION
August 3, 2026

No. 1-25-1327

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THERESA GUESS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 24 CH 10524 |
| | ) | |
| THE BOARD OF TRUSTEES OF THE DOLTON | ) | The Honorable |
| POLICE PENSION FUND, | ) | Neil H. Cohen, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held:*  Defendant pension board's administrative decision that plaintiff police officer was not entitled to line of duty disability pension benefits was against the manifest weight of the evidence.

¶ 2    The defendant Board of Trustees of the Dolton Police Pension Fund (Pension Board) appeals the trial court's reversal of its administrative determination to deny an application by the plaintiff, Theresa Guess, for line of duty disability pension benefits pursuant to section 3-114.1 of the Illinois Pension Code (40 ILCS 5/3-114.1 (West 2020)). We agree with the trial court that the Pension Board's determination was against the manifest weight of the evidence and must be reversed.

¶ 3                                                    BACKGROUND

¶ 4        The plaintiff is a police officer in the Village of Dolton. On March 31, 2020, she applied to the Pension Board to receive line of duty disability benefits claiming that she had begun experiencing disabling seizures as a result of a motor vehicle collision on September 27, 2018. That collision occurred when she was on duty responding to a "man-down call" with lights and sirens activated, and another vehicle unexpectedly turned in front of her patrol vehicle. She struck that vehicle and was deflected into the side of a brick house. In describing why she was disabled from service, the plaintiff wrote that her seizures cause her to experience memory loss, confusion, loss of balance, and other similar problems.

¶ 5        Over two days in 2023 and 2024, the Pension Board conducted a hearing on the plaintiff's application. At that hearing, testimony was given by the plaintiff and her sister, Mary Ann Terry, and 19 documentary exhibits comprising over 6600 pages were admitted into evidence. Most of these exhibits were medical records. Also included were reports and supplemental reports by three physicians retained by the Pension Board to review the plaintiff's medical records and/or conduct examinations of her. These three physicians were: (1) neurologist Lawrence P. Bernstein, M.D., who conducted a medical record review, (2) neurologist Anthony K. Savino, M.D., who conducted a medical examination of the plaintiff on November 18, 2020, and also reviewed her medical records, and (3) psychiatrist Stevan M. Weine, M.D., who conducted a psychiatric examination of the plaintiff on November 16, 2020, and also reviewed medical records. The record also included a report by a fourth physician, neurologist Neil Allen, M.D., who had examined the plaintiff on April 18, 2019, and reviewed records in conjunction with a separate worker's compensation claim.

¶ 6        The evidence in the administrative record shows that the plaintiff was 52 years old at the time of the collision. She was hired in 2009 after working since 1995 in the police departments of

several other Illinois municipalities. Prior to her hiring by Dolton, she underwent a psychological assessment. The licensed clinical psychologist who evaluated her found that she met all psychological standards required of a police officer candidate, including by demonstrating capacity to tolerate and manage stress. She thereafter worked as a full-time police offer for Dolton from 2009 through September 27, 2018, without any incident of experiencing seizure-like symptoms or other physical, mental, or psychological infirmity. She was not under the care of any physician for any neurological or psychological condition, and she had never been diagnosed with any seizure disorder prior to that date.

¶ 7       Following the collision, the plaintiff was transported to the emergency room at St. Margaret's Hospital. She was noted on physical examination to have a small forehead scalp hematoma in the midline without skin break. She did not report loss of consciousness. She was also noted to have musculoskeletal pain and injuries in her left index finger, right arm, and right thigh. She could move all extremities normally. She was treated and released that day.

¶ 8       Six days later, on October 3, 2018, the plaintiff returned to the emergency room after she passed out. There she complained of headaches, feelings of lightheadedness, and pain and soreness from her other injuries. A CT scan of her head and brain showed no evidence of acute intracranial abnormality. She was given a diagnosis of postconcussive syndrome and a note to be off work until cleared by a physician.

¶ 9       On October 10, 2018, the plaintiff was seen by Sheila Dugan, M.D., a physical medicine and rehabilitation physician with whom she had previously treated for an unrelated worker's compensation claim. She reported continued headaches and pain in her neck, back, thigh, and left knee since the collision. Dr. Dugan assessed her neurological examination as normal. She was prescribed physical therapy for her musculoskeletal injuries and occupational therapy to address

the left index finger sprain and swelling.

¶ 10    On October 23, 2018, the plaintiff was seen by neurologist Scott E. Lipson, M.D., reporting that she had been experiencing a constant headache since the collision. He assessed her as having had a mild concussion without loss of consciousness; frequent headaches, sleep disruption, vague visual difficulty, and photophobia consistent with postconcussion syndrome for which he stated she had a good prognosis for eventual recovery; and chronic posttraumatic headache, which he found to be compounded by medication overuse. He changed her medication and ordered that she not return to full duty at that time.

¶ 11    On October 30, 2018, the plaintiff was seen by a different neurologist, Samer Kassar, M.D., who along with his nurse practitioner, Sarah Williams, N.P. (NP Williams), thereafter became the plaintiff's primary treaters relevant to this case. At that first visit, the plaintiff's complaints were headache, neck and back pain, concussion, and lightheadedness. Dr. Kassar ordered a brain MRI and prescribed gabapentin 100mg to help with tension that he believed was the likely cause of her headaches. The MRI was normal.

¶ 12    On November 4, 2018, an incident occurred in which the plaintiff was cooking at home, felt lightheaded, and passed out. She injured her right knee in that incident and went to the emergency room. This incident was documented by Dr. Dugan's note on November 21, 2018, who added that the plaintiff hit her head on the stove and that her stepdaughter, who had witnessed the fall, told the plaintiff that "she was shaking." The incident was also documented by Dr. Kassar in his note of November 12, 2018. Dr. Kassar ordered an electroencephalogram (EEG) to evaluate this syncopal episode. He ordered her to continue gabapentin, prescribed Norco, and ordered her to remain off work for another month.

¶ 13    On November 27, 2018, Dr. Kassar wrote that he had reviewed the plaintiff's EEG and that

it showed "seizures caused by her MVA." He also wrote that it showed "intermittent right temporal slowing which can be associated with seizures. A digital spike analysis was performed which did not detect seizure activity." She was ordered not to drive, started on Depakote, and given a note to be off work for two months. Also on that date, Dr. Kassar performed a lumbar paravertebral spinal nerve block for lumbar spondylosis, which was followed by a cervical paravertebral spinal nerve block for cervical spondylosis on December 4, 2018.

¶ 14    Beginning as of December 18, 2018, most of the plaintiff's following records are cosigned by both NP Williams and Dr. Kassar, and we would interpret that the plaintiff was seen by both providers on some of these dates. On December 18, the plaintiff's complaints were migraines, neck stiffness, back pain, seizures, difficulty sleeping, and weight loss. The severe migraines appear to have been the primary problem at this visit. It was documented at this visit that the plaintiff and a family member present with her reported that she had more confusion and difficulty maintaining a train of thought. The plaintiff was started on the antiepileptic medication Lamictal 25mg on that date for seizures and also to help with migraines. Her other medications at that visit were Flexeril and Norco for her back pain and muscle tenderness, and amitriptyline for migraines. She was to wean off the Depakote over one week.

¶ 15    On January 8, 2019, she reported that she had experienced a seizure the Thursday before. She reported experiencing shaking and tremors in both hands episodically, and her husband also reported noticing this occur while she was sleeping. She also reported constant daily migraines. She reported no improvement in her memory loss after discontinuing Depakote. Her medications at that visit were Lamictal 50mg for seizures, amitriptyline, gabapentin, Toradol, Norco, and Flexeril. She was to remain off work with no driving "until seizures are managed." Follow-up EEG and MRI of the brain were also ordered.

¶ 16    On February 6, 2019, it was documented that the brain MRI had been unremarkable. The plaintiff reported having seizures every day that involved shaking in both hands at different times throughout the day. She also had seizures during sleep and altered awareness during seizures. She reported feeling tremors throughout her body. Lamictal was increased to 100mg, and it was documented that a second seizure medication would be added if her seizures persisted. She was also experiencing memory loss and episodes of confusion along with headaches, which NP Williams wrote that she explained to the plaintiff are "likely related to seizures. Once seizures are under control, these symptoms should improve." Her amitriptyline was discontinued because it caused visual hallucinations. She was continued on Flexeril and gabapentin. She was to remain off work until further evaluation.

¶ 17    The plaintiff's follow-up EEG was conducted over three days between February 8, 2019, and February 11, 2019. At her visit on February 14, 2019, Dr. Kassar interpreted it as showing seizure activity. He wrote that it indicated "generalized spike and wave and sharp waves with intermittent temporal slowing which can be associated with a seizure disorder." It was also documented that the plaintiff had been experiencing "a lot of shaking episodes, which she suspects are seizures." He added Keppra 250mg to the Lamictal 100mg for seizure control. She was ordered not to drive "for 3 months after seizure."

¶ 18    On March 4, 2019, the plaintiff continued reporting occasional lightheadedness and episodes of involuntary movement and shaking in one or both hands at times. She reported feeling that her overall symptoms had improved since starting Keppra 250mg, and her dosage was increased to 500mg in addition to Lamictal 100mg. It was also documented at this visit that the plaintiff was having "continued migraines most likely [due to] uncontrolled seizures. Will first treat seizures [and] monitor for an improvement in migraines." She was to remain off work and not drive.

¶ 19        On April 3, 2019, it was documented that the plaintiff stated that "she believes she can tell when she's about to have a seizure. Her hands turn really red, she becomes lightheaded, and her body feels shaky on the inside. [She] keeps a diary of symptoms." It was also documented that she "had a seizure 1.5 weeks ago, mild seizure with decreased awareness of surroundings, which lasted about 30 minutes."

¶ 20        On April 8, 2019, it was documented that the family member present with the plaintiff "reports that her seizures have worsened over the past several months. *** [S]he becomes very drowsy, and typically has seizures which have been longer than their typical duration. The episodes occasionally last several hours." The plaintiff was ordered to stop Keppra and Tinazidine.

¶ 21        On April 15, 2019, the plaintiff reported having had two seizures since her last visit. Her Lamictal dosage was increased from 100mg to 125mg. The possibility of implanting a vagus nerve stimulation (VNS) device for seizure control was first discussed at this visit.

¶ 22        It was at this point, on April 18, 2019, that the plaintiff underwent examination by neurologist Dr. Neil Allen for purposes of her worker's compensation claim. Significant to this appeal, Dr. Allen expressed disagreement with Dr. Kassar's impression that the plaintiff's EEG from February 2019 showed seizure activity. Dr. Allen wrote:

> "It is my opinion at this time that this examinee does not have a convulsive seizure disorder. It is my impression that she has nonconvulsive seizures; that the EEG does, in fact, show right temporal slowing which is consistent with her prior head injury. However, the EEG abnormality noted is not diagnostic of a seizure disorder. However, it does not either confirm or exclude the diagnosis of seizures. It is my opinion that the three-day EEG, at least that portion which I saw, which was a limited portion, was not convincingly suggestive of seizure activity, but, rather, suggestive of artifact."

Dr. Allen also wrote that he confirmed this finding with a board certified electroencephalographer. Dr. Allen wrote that from "a purely neurological standpoint," there was no reason to believe that the plaintiff could not return to desk duty. Dr. Allen recommended an independent review of the 72-hour EEG to determine whether it showed seizure activity and a 24-72 hour period at an inpatient facility with video observation and electrodes to determine whether she has actual seizure activity. There is no evidence in this record that the plaintiff underwent such observation until her admission to Rush University Medical Center in January 2021.

¶ 23        On May 20, 2019, the plaintiff had her next visit at the office of Dr. Kassar and NP Williams. She was documented as reporting "having about 2-3 seizures per day," and Lamictal 125mg was continued. She reported worsening memory loss, which NP Williams wrote that she explained to the plaintiff was "most likely [due to] uncontrolled seizures [and] medication [side effects]." It was documented that the records from her evaluation by Dr. Allen would be obtained, although we find nothing in the record suggesting that Dr. Kassar ever became aware of Dr. Allen's opinion above that he was misinterpreting the plaintiff's EEG or diagnosing her incorrectly with seizure disorder. She was again ordered to remain off work.

¶ 24        On June 17, 2019, it was documented that she was experiencing no side effects from the daily Lamictal 125mg, and the dosage was increased to 150mg. Her husband reported that prior to experiencing a seizure, the plaintiff's face will appear to sag, and she would have staring-off episodes and confusion. The plaintiff also reported a sensation of being off-balance while walking, and it was documented that she "needs a cane at all times to prevent from falling." She continued to have daily migraines that would last the whole day. It was also documented at this visit that the plaintiff was evaluated for the risks of opioid abuse and that her "mental health status has been assessed and addressed as appropriate."

¶ 25     On July 15, 2019, the plaintiff's husband reported her having generalized shaking with her seizures, which was "not her norm with seizures." He also noted episodes of her staring off and not speaking. She had a tremor in both hands and also her head, which was new. NP Williams also documented at this visit that the plaintiff's husband had requested "a letter for their lawyer stating her seizures are a result of her MVC which occurred on September 27, 2018. We will write up a letter explaining this, which Dr. Kassar also mentioned in his encounter note from 11/27/18." It was stated that she was not cleared to return to work and could not drive. A repeat limited EEG was ordered.

¶ 26     The EEG was performed on July 25, 2019. In a note from August 20, 2019, Dr. Kassar described it as "abnormal EEG [due to] focal epileptiform discharges in bitemporal T3 and T4 region. This EEG is supportive of potential focal epileptogenic focus in this region." It was further documented that "[due to] positive EEG results, will start [patient] on Oxtellar XR 600mg."

¶ 27     On September 30, 2019, it was noted that the plaintiff's husband had reported witnessing two syncopal episodes on September 28 where she had passed out and fallen over. Due to the syncopal episodes returning, she was directed to taper off Oxtellar over the following two weeks but continue Lamictal 125mg. An updated extended EEG was ordered due to the changes in seizures.

¶ 28     The extended EEG was performed on October 14, 2019. In the note of October 31, 2019, Dr. Kassar wrote that it was an "abnormal EEG with frequent electrographic seizures coming from bi-occipital regions. Also showing intermittent bi-temporal slowing which is indicative of brain dysfunction in this region." He also wrote, "When patient pressing button saying she's having headache or shaking that this is not associated with seizures." He also wrote that "it appears on EEG that [the] majority of her seizure [occurs] at night." He ordered her to taper up Lamictal to 250mg over the following two weeks.

¶ 29        On December 2, 2019, the plaintiff underwent a surgical procedure for the implantation of a VNS device in her left chest for seizure control and monitoring. This procedure was performed by Mohammad S. Shukairy, M.D. He reported in conjunction with this procedure that the plaintiff's brain MRIs did not demonstrate any focal neurological legion, but her EEG reveals persistent temporal lobe spikes.

¶ 30        At her next follow-up with NP Williams and Dr. Kassar, on December 11, 2019, it was documented that the plaintiff's husband had brought and showed them "a video of what appeared to be a symptomatic tonic clonic seizure." The VNS device was not yet activated at that time.

¶ 31        On December 16, 2019, the plaintiff's VNS device was activated for the first time, and the plaintiff was instructed how to use the magnet for seizure control. On December 30, 2019, the plaintiff reported "about 4 seizures a day." Data was obtained from the VNS device showing an "increase in autostim response in the past two weeks than the first two weeks. More often, they are occurring more in the evening time, around 6-7 PM and 12-1 AM."

¶ 32        On January 13, 2020, the plaintiff reported that her seizures were becoming less severe but occurring with the same frequency. On February 3, 2020, the plaintiff reported having a fall at home due to dizziness. She continued to experience severe migraines. On February 17, 2020, she reported that swiping the magnet on her VNS device alleviated some balance problems. She reported that her balance problems and confusion are worse in the afternoon and early evening.

¶ 33        The plaintiff underwent an ambulatory EEG on March 23, 2020. Dr. Kassar's note dated April 14, 2020, states "abnormal EEG monitoring with focal epileptiform discharges seen in the right temporal region which can be assoc[iated] with seizure disorder." It was also noted at this visit that the plaintiff reported feeling that "she had episodes when she was hooked up to EEG monitoring, namely 'shaking' while sleeping." The note further states that at this time, "it appears

the AEDs [(*i.e.*, antiepileptic drugs)] she takes are keeping a majority of the seizures at bay. [Patient's] fiancée does mention on the 2nd night of EEG monitoring, she had a few nocturnal seizures." This is the final medical record of the plaintiff's treatment with Dr. Kassar or NP Williams that is contained within the administrative record.

¶ 34    As stated above, the plaintiff's application for line of duty disability benefits was filed on March 31, 2020. On August 14, 2020, the Pension Board's counsel contacted INSPE Associates, Ltd., to obtain the services of three physicians to examine the plaintiff and/or review her medical records in conjunction with her application for disability benefits. See *id.* § 3-115. Each physician was thereafter asked to provide the Pension Board with a certificate of disability along with his opinion within a reasonable degree of medical certainty as to the following seven questions:

"1) Whether [the plaintiff] is disabled from performing full and unrestricted police duties and, if so, the nature and extent of any disability/disabilities present, including your specific diagnosis;

2) Whether [the plaintiff] suffered from any pre-existing conditions related to her claim for disability;

3) Whether [the plaintiff's] explanation of how the disability/disabilities occurred is consistent with your findings;

4) Whether the alleged disability/disabilities is a direct result of the September 27, 2018 incident; and if so, which specific duty-related activity(ies); or whether the disability resulted from an aggravation of a pre-existing condition; or whether the September 27, 2018 incident contributed to the disability; or whether the disability is solely caused by a pre-existing condition(s) and unrelated to the September 27, 2018 incident;

5) The likely duration of any such disability, if any (i.e., has the disability lasted one

(1) year or is expected to last (1) year, or result in death?);

6) Whether [the plaintiff] could perform in a limited or light duty capacity, if such a position was made available and offered to her; and

7) Whether [the plaintiff], if disabled, could undergo any additional reasonable medical care and treatment that could reasonably be expected to enable her to recover from her disability and enable her to return to full and unrestricted police offer duties. If so, what is the recommended treatment(s) and what are the risks associated with the treatment(s), and what is the probability of success should [she] undergo the treatment(s)?"

¶ 35     The first report received was dated September 28, 2020, by Dr. Bernstein, a board certified neurologist. Dr. Bernstein conducted a medical records review only and did not physically examine the plaintiff. In answer to question (1) in paragraph 34 above, Dr. Bernstein wrote that he disagreed with Dr. Kassar's opinion of November 27, 2018, that the EEG showed seizures. He wrote that the most important feature when identifying an event as "epileptiform" or not is a clear description from the person having the event or witnessing it as to what they were; in the plaintiff's case, the clinical behavior described is "unusually long and more consistent with PNES (psychogenic non-epileptiform seizures) rather than epileptic seizures as most events are too long." He noted that there were no ancillary symptoms of epileptic seizures reported, such as tongue biting during sleep or urinary incontinence. He wrote that "in summary it is my opinion the evidence in the medical record does not indicate a diagnosis of 'epilepsy' (unprovoked epileptic seizures) to a reasonable degree of medical certainty nor can such a diagnosis be attributed to the MVA of 09/27/2018. A diagnosis of PNES seems established. Totally excluding a diagnosis of comorbid epilepsy is not possible without additional evaluation."

¶ 36     As to question (2), Dr. Bernstein identified that no "comorbid conditions related to a risk for

epilepsy were found in the records reviewed." As to question (3), he wrote that it is "not consistent with her explanation as the magnitude of head injury (if any) is not likely to have been causally related to the development of epilepsy." As to question (4), he wrote, "The disability seems unrelated to the MVA [of] 09/27/2018. While correlation is present there is no causality."

¶ 37 As to question (5), he wrote that "[h]er disability could exist until it is firmly established that she only has PNES and treatment is established. If there is any comorbid epilepsy shown (not proven at present) [the] duration would depend on rules followed by the Dolton Police Board regarding [o]fficers who have experienced an epileptic seizure." As to question (6), he wrote that the plaintiff "should be eligible to perform a light duty position." As to question (7), he wrote that the plaintiff should undergo continuous video EEG in an epilepsy monitoring unit over 2 to 5 days "to ascertain if she has PNES or PNES with comorbid epileptic seizures."

¶ 38 The second report received was dated November 23, 2020, from Dr. Savino, who is also a board-certified neurologist specializing in managing acute concussion and postconcussion syndrome. Dr. Savino performed an examination of the plaintiff on November 18, 2020, and also reviewed her medical records from 2009 through April 2020. As to the first question set forth in paragraph 34 above, Dr. Savino wrote:

> "In my opinion, I do not believe [the plaintiff] is capable of performing full police duties due to multiple factors including convulsive events and what appears to be a great deal of psychological distress. The diagnosis in regards to her events, as supported by [her] and her sister's description of events, the provided video of one such event, the 'near-event' I witnessed during my evaluation and the provided medical records, is PNES (psychogenic non-epileptic seizure). Although one must consider concurrent epileptic seizures in these situations, there is no evidence of these in my review."

¶ 39       As to question (2), Dr. Savino wrote that the duration of disability was difficult to prognosticate but that he would "expect disability related to the these events to continue until they are properly addressed and she receives appropriate treatment." As to question (3), he wrote that "[a]lthough not related to the events, [the plaintiff] has a pre-existing history of ill-defined medical conditions which may also, at least in part, have psychological causes."

¶ 40       As to question (4), he wrote that "[the plaintiff's] explanation of the events is consistent with the diagnosis of PNES. The disability is not a direct result of the September 27, 2018 accident." As to question (5), the full extent of Dr. Savino's answer was, "In my opinion, the disability is not a direct result of the September 27, 2018 accident." He did not explicitly answer the aspect of the question as to whether the collision contributed to the alleged disability or was unrelated to it.

¶ 41       As to question (6), he wrote that the plaintiff was capable of performing in a limited or light duty capacity. As to question (7), he wrote that the plaintiff "needs evaluation and ongoing care from mental health including psychology and psychiatry as part of treatment for these events." Also, similar to Dr. Bernstein, he recommended that she undergo a two to five-day inpatient evaluation at an epilepsy monitoring unit "to fully clarify the nature of her events."

¶ 42       The third report received was dated November 29, 2020, by Dr. Weine, a board-certified psychiatrist. Dr. Weine performed a psychiatric examination of the plaintiff on November 16, 2020, and reviewed her medical records. Dr. Weine's answer to the first question set forth in paragraph 34 above was as follows:

> "[The plaintiff] is disabled from performing full and unrestricted police duties. However, in my opinion, her disability is not from convulsive seizures as she and Dr. Kassar claim. Based upon my review and examination, her current diagnoses are Psychogenic Non-Epileptic Seizures, Somatic Symptom Disorder (with predominant pain, severe), and

Substance Induced Mood Disorder.

I concur with the assessments of Dr. Bernstein and Dr. Neal [*sic*] that there is no EEG or clinical evidence in support of epileptic seizures and that Dr. Kassar misdiagnosed and inappropriately treated her.

Furthermore, her multiple pain complaints (back, headache, knee, finger), seem out of proportion to the actual medical explanation. Somatic Symptom Disorder involves: One or more somatic symptoms that are distressing or result in significant disruption of daily life; Excessive thoughts, feelings, or behaviors related to the somatic symptoms or associated health concerns as manifested by at least one of the following: Disproportionate and persistent thoughts about the seriousness of one's symptoms; Persistently high level of anxiety about health or symptoms, and; Excessive time and energy devoted to these symptoms or health concerns.

Lastly, Dr. Kassar's polypharmacy practice and liberal opioid prescribing has had the impact of making her dependent upon opioids and other mood-altering drugs and making her depressed and further impairing her daily functioning."

¶ 43    As to question (2), he noted that her problems had already lasted for more than two years, had gotten worse, and were likely compounded by Dr. Kassar's misdiagnosis and inappropriate treatment. He further wrote that her problems with psychogenic nonepileptic seizures, somatic symptom disorder, and substance-induced mood disorder were likely to continue. As to question (3), he wrote that the plaintiff had a preexisting history of migraines treated with medication (including Norco and Topamax) but otherwise had no known preexisting conditions related to her disability. As to question (4), his answer was as follows:

"No, her explanation is not consistent with mine. [The plaintiff's] explanation of how

the disability occurred is centered on the motor vehicle accident causing a convulsive seizure disorder. In my opinion, there is no evidence of a convulsive seizure disorder, and instead she has psychogenic non-epileptic seizures. In my opinion, although there may be some underlying medical explanation to explain in part her migraines and back pain, this is best understood as a Somatic Symptom Disorder. Thus, I do not agree that this suffering is adequately explained by any medical conditions but is instead best understood as a psychiatric disorder. I am unable to determine precisely the psychological causes, but I suspect that the five-year relationship with an abusive partner, and ongoing emotional and financial conflicts with her daughter could have contributed."

¶ 44 As to question (5) regarding causation, Dr. Weine wrote that the plaintiff's alleged disability caused by psychogenic nonepileptic seizures; somatic symptom disorder (with predominant pain, severe); and substance induced mood disorder "are a direct result of the September 27, 2018 accident." He added that, as he had noted above, he "suspect[ed] that other adverse circumstances regarding her former relationship and her family could have contributed to her disabilities" and "that her disability was compounded by misdiagnosis and inappropriate treatment by Dr. Kassar."

¶ 45 As to question (6), Dr. Weine wrote that Dr. Guess was not presently able to perform in a limited or light duty capacity "due to her ongoing symptoms, dependence on multiple sedating medications, and impaired role functioning." As to question (7), Dr. Weine provided an extensive answer that she needed treatment consistent with her psychological diagnoses. She also needed to stop receiving treatment for epileptic seizures, migraines, or back pain with antiseizure mediation, Norco, or other opiates. Instead, she needed antidepressants, physical therapy, and individual weekly psychotherapy with the aim of diminishing her somatic and depression symptoms and promote her level of familial, social, and occupational functioning.

¶ 46    On December 8, 2020, the plaintiff was seen by neurologist Michael C. Smith, M.D., of the epilepsy section of the neurological services department at Rush University Medical Center. She saw Dr. Smith apparently pursuant to a referral from Dr. Kassar's office for a second opinion on her seizures. Dr. Smith noted that she reported continuing "to suffer daily to weekly episodes of loss of consciousness." He ordered testing, including a three-day EEG with video monitoring, which occurred between January 5, 2021, and January 8, 2021.

¶ 47    The discharge summary for that admission indicates that during photic stimulation on the morning of January 7, 2021, she "had her typical episode of [bilateral] hand flapping with eyes closed and tears." She maintained consciousness and the ability to speak during the episode. She immediately returned to baseline after the hand flapping stopped, at which time she requested an increase in her dose of Norco. "Additional hand flapping episodes were also captured, and none had an abnormal epileptiform correlate on EEG." She was given a final principal diagnosis of psychogenic nonepileptic seizures and a referral to see Rush University Medical Center's epilepsy psychiatrist, Victor Patron Romero, M.D., for assessment of this new diagnosis.

¶ 48    On January 14, 2021, the plaintiff was seen by Dr. Patron Romero and resident physician Hannah Statz, M.D. In the notes from that visit, Dr. Statz documented that she had no psychiatric history or seizures until her on-duty collision in September 2018, at which time she began experiencing seizures one week later. Dr. Statz also wrote that the seizures tend to be stress-induced, and she will panic and experience shaking when stressors are high. Dr. Statz also wrote that, "[g]iven that patient [was] without any psychiatric symptoms or treatment prior to [September 2018], it is reasonable that some of [her] mood and reported cognitive symptoms could be related to head trauma." Dr. Patron Romero wrote in his note that he agreed with Dr. Statz's assessment. He also wrote the following:

"Why she developed PNES after suffering a car crash at work and a TBI, is not 100% clear after our first encounter, however, it is possible that initial avoidance because of an acute stress reaction, devolves in further stressors and PNES shortly after (a week after the car accident). It is also possible that the episodes are a combination of PNES and dissociative episodes.

It is possible that there is additional history of trauma not conveyed by the patient yet, and will continue to be explored as we build report and a therapeutic relationship."

¶ 49    On January 21, 2021, the plaintiff had a follow-up visit with Dr. Statz and Dr. Patron Romero. It was noted by Dr. Patron Romero that the plaintiff "endorses severe changes in her life due to epilepsy" and struggles to accept the diagnosis of psychogenic nonepileptic seizures. The plan was for her to start seeing a therapist for her symptoms. She had another follow-up with Dr. Patron Romero on February 18, 2021, at which time she reported "doing somewhat better" and was about to start psychotherapy. No further medical records from her treatment with these two providers are contained within the administrative record.

¶ 50    The plaintiff's above records from Rush University Medical Center were sent by the Pension Board's counsel to the three retained physicians. Each of them issued a supplemental report. Dr. Bernstein's supplemental report stated that his original report required no modification, except that the diagnosis of psychogenic nonepileptic seizures without comorbid epileptic seizures had now been confirmed. Dr. Savino wrote that it appeared "that the seizure-like episodes have significantly improved with stress reduction and mental health care" and that he would consider the plaintiff "fit for full duty with no restrictions from a neurological perspective." Finally, Dr. Weine wrote that his "opinion remains unchanged from my initial report."

¶ 51    On February 12, 2021, and March 1, 2021, the plaintiff underwent a neuropsychological

assessment performed by J. Singh, Ph.D., of Mid-America Psychological & Counseling Services, P.C. Of note, Dr. Singh's description of the history of her present problem describes it beginning with the collision, the seizures that began the following week, and how "her life was perfect until the accident" but had changed since that time. Following the administration of about 25 evaluations and tests, she was diagnosed with (1) mild neurocognitive disorder due to multiple etiologies, (2) generalized anxiety disorder, and (3) depressive disorder due to another medical condition.

¶ 52     Again, the plaintiff's neuropsychological assessment report was sent to the three retained physicians, and an additional supplemental report was obtained from all three. Dr. Bernstein wrote that the findings did not cause him to modify his original report. Dr. Savino wrote that his previous opinion was unchanged that the plaintiff was "fit for full duty with no restrictions from a neurological perspective." And Dr. Weine wrote that the "new findings do not change my opinion regarding her disability or the causation related both to the accident and to the other factors described in my initial report."

¶ 53     At the hearing, the Pension Board heard live testimony from Mary Ann Terry, the plaintiff's older sister. She testified that she and the plaintiff lived close to one another and saw each other frequently prior to the collision. When the collision first occurred, Terry did not think it was too much for her to worry about, but this changed when she got a call that the plaintiff had passed out. She began calling the plaintiff on the phone more frequently after that time; when she did so, she could tell "something was going on" because the plaintiff was confused, not comprehending, slurring her words, and repeating herself. This was very different compared to the plaintiff's condition before the collision. Terry testified that she drove the plaintiff and went with her to many of her doctors' appointments, because the plaintiff was "almost like a person [who] just didn't know what was going on." Since October 2020, the plaintiff has lived with Terry in her home, and

Terry sees her on a daily basis. She explained that prior to the collision, the plaintiff was a person who "could handle any emotional situation that came her way," whereas now "any type of trauma or *** situation that's going to affect her emotions *** is going to draw her to go into some type of a seizure." She describes two types of seizures that she observes the plaintiff experience. One involves the plaintiff's hands shaking badly and crying, but she can talk coherently. She describes the other type as like "a panic attack, a blank stare where she's like incoherent for just a few minutes." She experiences one or two seizures a month. The most recent one had occurred on the morning of the hearing, and she had also observed one the week prior to it.

¶ 54    The plaintiff also testified at the hearing. Most of her testimony consisted of going through the medical record history above without significant elaboration. She explained that she still sees Dr. Kassar and his nurse practitioners at his office, largely for extracting data from the VNS device. She was not asked in her testimony to describe the seizures she experiences. There was also no testimony about when she began to experience any symptoms relative to her collision beyond reference to the incident of passing out six days after the collision. She has been restricted from operating a vehicle since the time of her collision. She testified in essence that she does not have a clear understanding of her precise diagnosis, except that it has a psychological as well as neurological component. She had also been treating with a psychologist, Christine Lang Reece, but had to discontinue treatment after that provider was indicted for alleged Medicare fraud and stopped returning her calls to set up appointments.

¶ 55    The Pension Board's administrative determination was that the plaintiff was not entitled to line of duty benefits under section 3-114.1 of the Pension Code. *Id.* § 3-114.1. The key finding set forth in its 22-page decision and order was that the plaintiff failed to prove causation between an act of duty (*i.e.*, the motor vehicle collision of September 27, 2018) and seizure disorder. It

reasoned that all three retained physicians had agreed that the plaintiff's diagnosis was psychogenic nonepileptic seizures, and she had "failed to prove that a car accident caused her PNES." It reasoned that her initial treatment in the emergency room was for injuries unrelated to her claimed disability and that she did not begin to experience what she describes as "seizures" until several days later. When the plaintiff sought treatment for that, she was misdiagnosed by Dr. Kassar with seizure disorder and treated based upon this incorrect diagnosis, which likely hindered her recovery and exacerbated her condition.

¶ 56    The Pension Board further found, however, that the plaintiff "is disabled because of PNES that is unrelated to the September 27th incident." It wrote that two out of the three retained physicians agreed that she was disabled from full, unrestricted police duties because of her disability, and that Dr. Bernstein and Dr. Savino both "found there is no causal connection between the September 27th incident and [the plaintiff's] disability." While it cited Dr. Weine's finding that the collision "contributed" to her disability, it emphasized that he had additionally "acknowledged [the plaintiff's] personal troubles also caused her disability" and had "opined Dr. Kassar compounded [her] disability by misdiagnosing and inappropriately treating her." Thus, it concluded, "[f]or various reasons, [the plaintiff] is disabled, but the Pension Board finds an act of duty did not cause or contribute to [her] disability." Accordingly, it found that she was entitled to nonduty disability benefits but was not entitled to line of duty benefits. See *id.* § 3-114.2.

¶ 57    The plaintiff thereafter sought administrative review of the Pension Board's denial of her application for line of duty benefits. The trial court ruled that the Pension Board's findings and decision to deny the plaintiff's application for line of duty disability benefits were against the manifest weight of the evidence. The Pension Board now appeals, requesting that we reverse the trial court and affirm its administrative decision.

¶ 58                                                    ANALYSIS

¶ 59        Judicial review of the Pension Board's decisions is governed by the provisions of the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2020)). See 40 ILCS 5/3-148 (West 2020). It is well established that in administrative review cases, we review the decision of the administrative agency, not that of the trial court. *Covello v. Village of Schaumburg Firefighters' Pension Fund*, 2018 IL App (1st) 172350, ¶ 40. The Pension Board's findings and conclusions on questions of fact are held to be *prima facie* true and will not be overturned unless they are against the manifest weight of the evidence. *Scepurek v. Board of Trustees of the Northbrook Firefighters' Pension Fund*, 2014 IL App (1st) 131066, ¶ 17. The Pension Board's decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 534 (2006). The mere fact that an opposite conclusion is reasonable or that we might have ruled differently will not justify reversal of the administrative findings. *Id.* In examining its factual findings, we do not weigh evidence or substitute our judgment for that of the Pension Board. *Id.* If the record contains evidence supporting its decision, that decision should be affirmed. *Id.*

¶ 60        A police officer is entitled to line of duty disability pension benefits if he or she, "as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty, is found to be physically or mentally disabled for service in the police department, so as to render necessary his or her suspension or retirement from the police service." 40 ILCS 5/3-114.1(a) (West 2020). The burden of proof is on the officer claiming benefits. See *Covello*, 2018 IL App (1st) 172350, ¶ 43.

¶ 61        The parties agree that causation is the sole issue in this appeal. In establishing causation in this context, it is not required that a duty-related incident be the originating or primary cause of

the injury, although a sufficient nexus must exist between the injury and the performance of the duty. *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 505 (2007). Thus, for example, a disability pension may be based upon the line-of-duty aggravation of a preexisting condition. *Id.* Likewise, it is well established that "a disability may result from multiple causes" and that a claimant "need not prove that a duty-related accident is the sole cause, or even the primary cause, of his disability." *Luchesi v. Retirement Board of the Firemen's Annuity & Benefit Fund of Chicago*, 333 Ill. App. 3d 543, 550 (2002). "The claimant must prove only that the duty-related accident is a causative factor contributing to the claimant's disability." *Id.*

¶ 62    The Pension Board, in arguing that its administrative decision was not against the manifest weight of the evidence, takes the position that the plaintiff failed to present sufficient evidence that the motor vehicle collision of September 27, 2018, caused her disability. It emphasizes that the plaintiff's ultimate diagnosis was psychogenic nonepileptic seizures, which is a psychological condition. It asserts that psychogenic nonepileptic seizures involve "episodes that resemble epileptic seizures but the '[c]linical findings provide evidence of incompatibility between the symptom and recognized neurological or medical conditions.' " See American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 318-19 (5th ed. 2013). Thus, it asserts, by definition this condition causes seizures without evidence of any underlying neurological or medical cause. It contends that the diagnosis itself shows that the collision of September 27, 2018, did not give rise to the plaintiff's medical condition, and the plaintiff never introduced evidence showing, for example, that a motor vehicle collision can trigger psychogenic nonepileptic seizures.

¶ 63    It further asserts that the plaintiff sustained relatively minor injuries in the collision, namely orthopedic injuries and headaches. It cites the October 10, 2018, finding by Dr. Dugan that her

neurological examination was normal. It also cites the October 23, 2018, note by Dr. Lipton diagnosing her with several conditions but assessing her chances at recovery to range between good and excellent. It asserts that the plaintiff was unsatisfied with these diagnoses and treatment plans and thus sought out Dr. Kassar through her own research. It emphasizes that Dr. Kassar treated her by prescribing Norco and asserts that the plaintiff "overused" this medication. While it acknowledges that Dr. Kassar interpreted the plaintiff's EEG from November 2018 as "showing seizures caused by her MVA," the Pension Board asserts that the evidence—specifically the reports of Drs. Bernstein and Weine—established overwhelmingly that this diagnosis by Dr. Kassar was incorrect and that his treatment based upon it was improper.

¶ 64        The Pension Board goes on to cite the diagnosis of psychogenic nonepileptic seizures made in January 2021 by Dr. Patron Romero. It states in its appellate brief that he found "no causal link to the September Incident" and "noted there may be additional trauma not disclosed by Plaintiff that is contributing to her condition." It also cites the neuropsychological assessment performed in February and March 2021 by Dr. Singh and again maintains in its appellate brief that Dr. Singh did not identify the motor vehicle collision as a cause of disability, instead writing that plaintiff " 'says her life stressors were setting off her seizures.' " It thus draws the conclusion that "every treating medical doctor disagreed with Dr. Kassar" and concluded that the plaintiff's "disabling condition resulted from psychological disorders unrelated to the September Incident."

¶ 65        The Pension Board further concludes that "[n]one of the multiple doctors who diagnosed Plaintiff with [psychogenic nonepileptic seizures] ever linked the September Incident to Plaintiff's disabling condition;" that she never reconciled her lack of symptoms following the collision with the seizure symptoms "which started after the unnecessary and improper medical treatment" by Dr. Kassar; and that the causation opinions of Drs. Bernstein and Savino are thus "uncontroverted

by any objective medical evidence." Although it acknowledges that Dr. Weine expressed an opinion causally connecting the plaintiff's disability to the collision, it asserts that it was its purview to "place little weight" on his causation opinion, characterizing it as "conclusory" and "troublesome" due to his failure to reconcile the lack of symptoms following the collision, Dr. Kassar's misdiagnosis and improper treatment, and the impact of multiple personal matters that contributed to the plaintiff's disability.

¶ 66     After careful consideration of the Pension Board's arguments and review of the full administrative record, we hold that it was against the manifest weight of the evidence for the Pension Board, despite finding that the plaintiff was disabled from police service because of psychogenic nonepileptic seizures, to conclude that the evidence failed to show the requisite causal nexus between the plaintiff's on-duty collision of September 27, 2018, and her disabling condition. Principally, we find it inexplicable for the Pension Board to have placed such great emphasis on the plaintiff's diagnosis being psychiatric in nature while concurrently disregarding the opinion of its retained psychiatrist, Dr. Weine, that "[t]he alleged disabilities caused by Psychogenic Non-Epileptic Seizures, Somatic Symptom Disorder (with predominant pain, severe), and Substance Induced Mood Disorder are a direct result of the September 27, 2018 accident." Despite this clear opinion of a direct causal nexus by its retained expert in the most relevant medical field, we find it unreasonable for the Pension Board to choose instead to rely on more ambiguous statements about causation made by the neurologists, which appear in context to be referring to epilepsy. We further find that the Pension Board draws unwarranted conclusions about causation based on isolated statements in medical records and the fact that certain treating physicians did not express clear causation opinions in their medical records. Finally, it draws a conclusion not supported by any medical evidence that Dr. Kassar's incorrect diagnosis of epilepsy or his treatment of the

plaintiff with antiepileptic medication or opioids somehow negates causation.

¶ 67    The Pension Board argues that the timing of the plaintiff's seizure symptoms as beginning shortly after the collision does not prove that it caused them. We do not dispute this as a general proposition, but it is nevertheless important evidence that prior to the collision at issue, the plaintiff had no history of experiencing seizure-like symptoms. The evidence showed that in 2009, prior to her hiring by the Dolton police department, she successfully underwent a psychological assessment in which she demonstrated the capacity to tolerate and manage stress. There was no evidence in the administrative record that, during the nine years between her date of hiring and the collision, she had any difficulty performing her duties as a police officer due to seizure-like symptoms; problems with handling stressful situations; or any other physical, mental, or psychiatric condition.

¶ 68    Although the Pension Board's argument emphasizes the minor nature of the plaintiff's injuries in the collision and characterizes them as mostly headaches and orthopedic injuries, it is also undisputed that the plaintiff hit her forehead during this collision and was diagnosed with postconcussion syndrome. The medical records indicate that beginning the following day, she began experiencing chronic headaches or migraines that had not previously been present. These continued through the duration of her treatment as documented by the medical records in evidence. The plaintiff's first syncopal episode occurred only six days after the collision, when she experienced lightheadedness and passed out. The second reported episode occurred approximately one month later, which was accompanied by shaking. She continued to report symptoms of lightheadedness, hand shaking, and occasionally passing out throughout the duration of time reflected by the medical records in evidence. Although Dr. Allen, the plaintiff's treaters at Rush University Medical Center, and the Pension Board's three retained physicians all disputed the conclusion that the plaintiff's seizures were epileptic in origin, we find no dispute in the evidence

that these were real, physical events experienced by the plaintiff even if they were caused by a psychological diagnosis.

¶ 69    It is evident from our review of the record that at the time Dr. Allen, Dr. Bernstein, and Dr. Savino issued their original reports, these neurologists' primary focus was whether Dr. Kassar was correct in his diagnosis of the plaintiff's seizures as epileptic and his interpretation of the EEGs as showing epileptic seizures. Dr. Allen, in his April 2019 report made in conjunction with the plaintiff's worker's compensation claim, wrote that his opinion was that the plaintiff "does not have a convulsive seizure disorder. It is my impression that she has nonconvulsive seizures; that the EEG does, in fact, show right temporal slowing which is consistent with her prior head injury. However, the EEG abnormality noted is not diagnostic of a seizure disorder."

¶ 70    Dr. Bernstein, in his report of September 28, 2020, draws similar conclusions. He similarly does not dispute that the plaintiff is experiencing real, physical events, but he concludes that they are "too long" to be epileptic in nature and lack ancillary symptoms of epileptic seizures such as tongue biting in sleep or urinary incontinence. His conclusion is thus that the medical record evidence "does not indicate a diagnosis of 'epilepsy' (unprovoked epileptic seizures) to a reasonable degree of medical certainty nor can such a diagnosis be attributed to the MVA of 09/27/2018. A diagnosis of PNES seems established." His answers to every question in his report are framed as ruling out epilepsy as a diagnosis. See *supra* ¶¶ 34-37. Thus, our interpretation is that when he states in answer to question (4) that "[t]he disability seems unrelated to the MVA [of] 09/27/2018" and that "[w]hile correlation is present there is no causality," he is likewise referring here to her claimed disability from epilepsy. Nothing in his report suggests to us that he was intending by this answer to express any opinion whether or not the collision is a causative factor that contributed to the plaintiff's development of psychogenic nonepileptic seizures. As a

neurologist, not a psychiatrist, we would not necessarily expect him to express any sort of causation opinion concerning a psychiatric diagnosis without explicitly stating that it was his intent to do so, particularly if it was based only upon a review of medical records that included no psychiatric examination directed at investigating this issue. As such, we conclude that this statement in his report is too ambiguous to support the proposition that the collision had no causal relationship to the plaintiff's development of psychogenic nonepileptic seizures.

¶ 71    We draw a similar conclusion concerning Dr. Savino's report. When Dr. Savino diagnosed the plaintiff with psychogenic nonepileptic seizures, he wrote only that "[t]he disability is not a *direct result* of the September 27, 2018 accident." (Emphasis added.) This statement does not negate causation under the applicable legal standards. As we stated above, there is no requirement in this context that a disability be a "direct result" of an accident or injury incurred in the performance of an act of duty. In other words, the duty-related accident does not need to be the originating or primary cause of the injury, provided a sufficient nexus exists between the injury and the performance of the duty. *Wade*, 226 Ill. 2d at 505. A disability may result from multiple causes, and a claimant need not prove that the duty-related accident is the sole cause, or even the primary cause, of her disability to qualify for line of duty benefits. *Luchesi*, 333 Ill. App. 3d at 550. Dr. Savino was asked in question (4) to opine also whether the collision "contributed to the disability" or was "unrelated," but he failed to answer any of the latter aspects of this multipart question. For these reasons, we conclude that Dr. Savino's report likewise cannot support the proposition that the collision had no causal relationship to the plaintiff's development of psychogenic nonepileptic seizures.

¶ 72    We also find that the Pension Board significantly misinterprets the medical records of Dr. Patron Romero when it states in its appellate brief that he made a "finding [of] no causal link"

between the collision and the plaintiff's psychogenic nonepileptic seizures. We emphasize that Dr. Patron Romero was a treating physician, not a physician retained to provide opinions. As such, it is not unexpected that his treatment notes would not include an express opinion as to causation. More importantly, however, despite his notes not containing an express opinion one way or another, we do not believe that his records can be interpreted as likely supporting an opinion that no causal relationship exists between the collision and the plaintiff's psychogenic nonepileptic seizures. His treatment notes, together with those of his resident physician Dr. Statz, make clear that the collision was the inciting event of the plaintiff's seizures. Dr. Statz wrote that considering the plaintiff had no "psychiatric symptoms or treatment prior to [September 2018], it is reasonable that some of [her] mood and reported cognitive symptoms could be related to head trauma." Dr. Patron Romero wrote that he agreed with this impression.

¶ 73        Dr. Patron Romero also wrote that "[w]hy she developed PNES after suffering a car crash at work and a TBI, is not 100% clear after our first encounter, however, it is possible that initial avoidance because of an acute stress reaction, devolves in further stressors and PNES shortly after (a week after the car accident)." By this statement, Dr. Patron Romero appears to be hypothesizing a potential reason for the plaintiff's development of psychogenic nonepileptic seizures a week after her car accident. Stating that the reason is "not 100% clear" is far different than finding to a reasonable degree of medical certainty that a causal relationship is nonexistent.

¶ 74        We find the same concerning the Pension Board's similar reliance on the fact that Dr. Singh did not identify the collision as a cause of disability in his neuropsychological assessment report. Dr. Singh was also a treating neuropsychologist, not an expert retained to offer opinions, so the absence of an opinion as to causation is not unexpected. His report also clearly describes the collision as the inciting event of the "life stressors [that] were setting off her seizures." Nothing

within this report supports the proposition that no causal nexus exists between the collision and the plaintiff's disability.

¶ 75    In contrast to the above statements relied upon by the Pension Board, which are at best ambiguous on the causal relationship between the plaintiff's on-duty collision and her disability from psychogenic nonepileptic seizures, psychiatrist Dr. Weine conducted a psychiatric examination of the plaintiff, reviewed her records, and expressed an opinion on causation with clear reference to the diagnosis of disability being psychogenic nonepileptic seizures. And as stated above, Dr. Weine's opinion was that "[t]he alleged disabilities caused by Psychogenic Non-Epileptic Seizures, Somatic Symptom Disorder (with predominant pain, severe), and Substance Induced Mood Disorder are a direct result of the September 27, 2018 accident."

¶ 76    The Pension Board argues that it acted within its rights in placing "little weight" on Dr. Weine's opinion. It characterizes his opinion as "conclusory" and "troublesome" due to his failure to reconcile the lack of symptoms following the collision, Dr. Kassar's misdiagnosis and improper treatment, and "the impact of multiple personal matters that contributed to the plaintiff's disability."

¶ 77    The evidence does not support the Pension Board's characterization of Dr. Weine's report or its reason for rejecting his conclusions.  As noted by the trial court, Dr. Weine is an internationally renowned psychiatrist and thus the Pension Board's retained expert in the medical field most relevant to the diagnosis of disability. His initial report was 10 pages in length. It reflects a full review of the plaintiff's medical records and a recognition that the diagnosis of epileptic seizures by her treating physician had been called into question, with the suspected diagnosis being psychogenic nonepileptic seizures. Thus, Dr. Weine undertook a psychiatric examination of the plaintiff directed at investigating whether there was a psychiatric diagnosis for her seizures. His

report details various statements by the plaintiff about her relationships with her family members. These indicate stress from her feeling that she was a burden due to her seizures and from fights stemming from her lack of income due to her inability to work. He wrote at one point that she stated that " 'having the accident caused these problems. I would have been able to work. I never had no problems. Never ever in life.' " He also documented her medications, noting that she took Norco up two or three times a day for her migraines as prescribed by Dr. Kassar and NP Williams.

¶ 78        Contrary to the Pension Board's argument, we find no failure by Dr. Weine in this report to evaluate and reconcile the potential other causes of the plaintiff's psychiatric disability with the collision. Instead, we find that Dr. Weine's report is by far the most thorough evidence in this case evaluating the plaintiff's psychological disability and its causal connection with the collision of September 27, 2018. We thus find it inexplicable why the board would call it "conclusory" or "troublesome" and decide that it deserved "little weight," particularly given the Pension Board's finding that the plaintiff had a psychological disability.

¶ 79        As for the Pension Board's emphasis on Dr. Kassar's misdiagnosis of the plaintiff's seizures as epileptic, his allegedly inappropriate medical treatment of them as such, and his prescribing of Norco for migraines, the Pension Board cites no legal authority for the proposition that causation is affected by the fact that these "exacerbated" or "compounded" the plaintiff's symptoms. In the analogous setting of tort law, causation is generally not defeated by the fact that subsequent medical treatment is improper or aggravates the injury stemming from the tortious event. See *Gertz v. Campbell*, 55 Ill. 2d 84, 88 (1973). The Pension Board makes no legal argument that any different rule applies under the Pension Code. Absent any such citation to legal authority or argument addressing this issue, we decline to discuss it further except to say that we find no basis in the medical evidence for concluding that causation was negated by any of these factors.

¶ 80     In conclusion, we are mindful that the manifest weight of evidence standard of review is highly deferential, but " 'the deference we afford the administrative agency's decision is not boundless.' " *Kouzoukas v. Retirement Board of the Policemen's Annuity & Benefit Fund of the City of Chicago*, 234 Ill. 2d 446, 465 (2009) (quoting *Wade*, 226 Ill. 2d at 507). Our review cannot amount to a "rubber stamp" of the proceedings below merely because the Pension Board heard witnesses, reviewed records, and made the requisite findings. *Bowlin v. Murphysboro Firefighters Pension Board of Trustees*, 368 Ill. App. 3d 205, 211 (2006). Instead, "[w]hen reviewing an administrative agency's decision, we may put aside any findings which are clearly against the manifest weight of the evidence." *Kouzoukas*, 234 Ill. 2d at 465. In this case, our review involved exactly the same records and reports examined by the Pension Board; none of the physicians testified at the administrative hearing, and thus factors such as the demeanor of the testifying witnesses did not figure into an assessment of credibility. See *Wade*, 226 Ill. 2d at 506 (same). Having carefully reviewed these records and reports, our conclusion is that they do not provide evidentiary support for the Pension Board's finding that the plaintiff's on-duty collision of September 27, 2018, was not a causative factor that contributed to her disability from psychogenic nonepileptic seizures. We find that the opposite conclusion is clearly evident, and thus we hold that the Pension Board's administrative finding was against the manifest weight of the evidence.

¶ 81                                    CONCLUSION

¶ 82     For the foregoing reasons, the administrative decision of the Pension Board that the plaintiff was not entitled to line of duty disability pension benefits is reversed. The judgment of the circuit court is affirmed.

¶ 83     Circuit court judgment affirmed.

¶ 84     Pension Board decision reversed.